Thank you, Your Honors. Good morning. May it please the Court, Colin O'Brien on behalf of the Keys, the Appellants. This is a very basic case as far as we're concerned. The Keys were defrauded in buying real estate. They settled the case to obtain How were the Keys defrauded, Mr. O'Brien? Did they have the requisite number of shares owned before April 6th? Well, your question requires me to answer it in two parts, if I may, Your Honor. Yes. The first part, they were defrauded long before the settlement. They, like a bunch of other homeowners, bought into a resort in Nicaragua, and they and some other homeowners sued. Well, you're here to enforce the settlement, right? We're here to enforce the settlement, yes, Your Honor. But the question is, regardless of what happened, delay in responses and so forth, if they didn't have the sufficient number of shares on April 6th, why does it matter? Well, they did, but I think the background, the backdrop is actually important for the equities. Well, they actually had the 1.3 or 1.4 million shares needed to purchase what is it, Allegria? Allegria, yes. Allegria. Yeah, I believe so, Your Honor. That's the name. So this comes down to what does transfer mean in obtain? And so the parties were negotiating what it meant to obtain and transfer. And the reason why I want to go back to who has the property. I want to go back to Judge Wynn's question. Okay. Did they have the 1.4 million shares? Because the record before me doesn't indicate. They were trying to get them, but trying to get and having, of course, are two different concepts. Well, this is the heart of the issue. What does it mean to transfer? And it was not defined in the settlement agreement. The keys thought they had it. And the record I would cite to Your Honors is document 116-1, pages 22 and 23 of 105. Can you give me that record cite again? Sure. It's document 116-1. And it's a 105-page document. So it's the 22nd and 23rd pages. And it's the settlement agreement. And it starts on the 22nd page, which at the bottom right is page 3 of the settlement agreement. And it says very simply, they shall, let's see. Wait a minute. Settlement agreement page 3? Page 3 and 4. Okay, go ahead. Is what this is all about. What does it mean to transfer these shares? What does it mean to transfer the shares? And it was not defined. So what happened is that throughout the process of trying to meet this 160 days, which was April 6th. No, no, no. Wait a minute now. You just said the settlement agreement says something, and then you didn't point me out to where exactly it says that. Okay. So the top of page 4 of the settlement agreement, which would be 23 of 105, in order to do so. Well, I'll read it, Your Honors. I'll just read it. What paragraph is that? This is the top, the first. It's a cutoff paragraph. I'll just read the operative paragraph. Give me the number of the paragraph or the letter. Roman numeral 4, subsection B. 4D? B. B as in boy. B as in boy. Okay. I got you. Go ahead. So the defendant grants to the Keys the option to convert shares under the plan and to convert the shares to a fee interest. The Keys intend to acquire the housing unit known as Alegria by purchasing sufficient additional B shares to do so. In order to accomplish the conversion, now I'm on page 4. Yes. In order to accomplish the conversion, plaintiffs shall collectively transfer the 1.3 and change million class B units to the defendants within 160 days of the agreement. What does it mean to transfer? So part of the issue was way back in September, the Keys ---- Before you get there, though, before you can transfer this 1,344,389.38 B shares, you have to have them, don't you? No. That's the issue. That's the issue. Because if you go down ---- No, no, wait a minute. Because just before that part you read, what you read earlier is that they shall purchase sufficient additional class B shares, and they didn't purchase them. Well, I don't ---- Purchase is pretty clear, isn't it? No, it's not clear because it was never defined how to purchase it, and that's the issue, Your Honor. Not how, but to accomplish a purchase. You have to get title. May I ---- That's a purchase, isn't it? No. No. The issue was there were no physical certificates of these shares sent out. So there were logistical problems. I don't know, but you still have to get title to the shares. No, that's a purchase. Well, how do you purchase a share? That's exactly the problem. We were trying to ---- Ordinarily. Your Honor, this is not an ordinary case. This is a case of ---- Oh, you start with the ordinary understanding of the term purchaser. Okay. Is there some parole evidence that you introduced that says purchaser means something that was otherwise ordinarily understood? Yes, exactly. And what does the parole evidence say purchaser means? The evidence is we were trying to figure out who actually had the shares. There were no physical copies of these shares. What did the parole evidence show that purchaser means in this agreement? The purchasers are the people that were designated in a spreadsheet to have control of the shares. The plaintiffs were saying to the defendants, hey, we want to buy these shares from these people. There were no physical certificates of the shares given. But you didn't do it by the deadline. There was no mechanism for doing it. I want to just make another point of this clear. It was either to buy the shares from existing owners, or if there was a shortfall, the last paragraph, Your Honors, was to buy them directly from the parties. Oh, you could have bought them directly from the company at $0.10 a share. Correct. Or you could have bought them from other shareholders at $0.01 or $0.02 a share. Trying to get it cheaper from other shareholders. You were trying to get it cheaper. Correct. But when you came up on April 6th, you didn't have either an agreement with the other shareholders or with the company to purchase. You had a little under 150,000 shares. So you were almost a million shares short as of April 6th, weren't you? No, Your Honor. This is the issue. There was no agreement on how to actually get the shares. Wait. You keep skipping a step. There was no agreement to get the shares. First, look, if you and I agree that I'm going to get 50 shares from you, then we can get to the next step of how I get those shares. But first we have to agree that I'm going to sell you the shares or you're going to sell me the shares. And that was done in a spreadsheet. That was March 27th spreadsheet. The Keys presented a spreadsheet. Here's the shares. Well, why were you contacting Mr. what's his name? Hankler? Hankler. Yeah. I thought that your conversation, your client's conversation with Hankler were that we don't have all of the shares yet. Tell us how we can get these additional shares that will bring us up to the $1.3 million, 1.3 million share number. So that was in the beginning. The beginning was the plaintiffs said, here are the shares, here's our tally, our 148,000. Another important point. No, but. The 148,000. Wait a minute. Was there a representation that all the shares listed on that spreadsheet had already been purchased? No, that was the whole point. That was the whole point, Your Honor. But the answer is no. No, but Your Honor, what I would like Your Honors to understand is that the Keys had 148,000 shares. They were never given any certificates. It's just like they had them. It's all right. You can transfer shares on the. There's no paper. Let me finish. You can transfer shares on the stock register of the corporation. Everybody knows that. But the question is, the question is, this so-called spreadsheet is not a representation that all these shares had been purchased. They agreed to do the spreadsheet. They agreed what? They agreed, send us a spreadsheet with all the shares. But wasn't the purpose of the spreadsheet to indicate how many outstanding shares were available to be purchased? Right. Not that you had purchased, but these were the ones that were extant. Here's the ones that I'm going to purchase, Mr. Hankla. You wanted a spreadsheet. First of all, you wanted me to put it on the register. All right. Show us in the record where there had been an agreement, as Judge Tshima was alluding to, where there was an agreement that they were going to purchase these shares, and all that was left to consummate the deal was the actual transaction itself. But the agreement had been made. I would point Your Honors to document 116-1. Now, this is a declaration of Mr. Key. We're on page 16 of 105 at the top. So, again, it's a 105-page document. It's a declaration attaching exhibits. This is the declaration. Wait a minute. Key declaration page what? The key declaration. Right. What page? At pages 15 and 16. So this is the March sequence. What paragraph? I would start at paragraph 37, and I would get to paragraph 40 is the way I would answer Your Honors' question. See, now, even paragraph 37 is a spreadsheet of a list of people I was buying B shares from. It doesn't say that I have bought B shares from. He's speaking in the future tense. He didn't have it locked down. I think that's the point. That's not the issue. Well, that's what he says. He says I'm buying them. He didn't say I bought them. That's not the issue, Your Honor. Having bought them is the same as having purchased them, isn't it? Your Honor, we're talking about good faith, fair dealing, okay? Well, wait a minute. You said this shows that he purchased them. It does show it. They agreed to this procedure of sending a spreadsheet with the shares that he was going to purchase. That he was going to purchase. Exactly right. It's before April 6th. But he never did purchase them. Because he never returned his e-mail or calls. How can he purchase them? He told them to first put in escrow. He put $9,000 in escrow. He said, no, no, no, no, no, no, no, no escrow. Send me a spreadsheet. I want a spreadsheet with all your shares. We don't do this piecemeal. This is also in the declaration. I can refer Your Honors to that. We don't need an escrow. Just send us a spreadsheet. All right. We've taken you over your time. But I'll give you a couple of minutes for about all. Let's hear from the other side. Good morning, Your Honors. May it please the Court. I am Michael Emling for the Pelican Defendants. The gist of our brief, of course, was that no one has really told me what error the trial court made. I take it to be a finding of fact error. And there would have to be some sort of clear showing that the trial court made an error in its findings and facts. That didn't really happen here. The basic phenomenon is we have a settlement agreement that was negotiated in front of the district court and with lawyers on both sides, and the district court kept jurisdiction over it. As the court notices, Mr. Key had an obligation, if he wanted to get Casa Alegría, to go and purchase roughly a million and a half B shares of the company and tender them to the defendants. That did not happen by April the 6th. What happened by April the 6th is that Mr. Key tendered a spreadsheet list of shares that he intended to acquire. He had not acquired them. Well, I take it by his argument that he was acting in good faith because this was the procedure that was agreed to. Send me a spreadsheet. You don't need to formalize it. Well, and I think if he had sent us a spreadsheet of a million and a half shares that he actually owned, we wouldn't have had any problem with that. But that's not what happened. He sent us a spreadsheet of a million and a half shares that he had not purchased, and that, in fact, in some cases, the person on the list didn't own them to start with. In some cases, the person on the list had refused to sell them, and it didn't add up to a million and a half shares. So... As simple as that. Well, but Mr. O'Brien's position seems to be that somebody at Pelican, and maybe Mr. Henkla, in effect, I don't want to say interfered, but didn't carry out their part of the agreement to assist the Keys in making these purchases. In other words, they blocked every effort the Keys made to complete the purchase. Isn't that his case? The argument below was, in fact, that the Pelican parties had interfered with Mr. Keys' ability to buy these shares. The finding of the trial court was, no, that did not happen, based on the evidence. Well, what do you mean by finding? Is it in Judge Walsh's opinion? In Judge Walsh's opinion, he brings up, for example, the situation where two of the potential sellers were getting divorced, and Mr. Key was uncertain about how you would go about purchasing shares from people who were getting divorced, and he called Mr. Henkla, who was not a lawyer, for some reason, and expected Mr. Henkla to respond within a couple of days about how to do that, and Judge Walsh pointed out that it was not Mr. Henkla's job to answer legal questions. What did Mr. Henkla say? You should see a lawyer? Well, I'm not sure what Henkla was supposed to say. No, what did he say? I don't think Henkla said anything about it. In Henkla's testimony, what Henkla said, I talked to Mr. Keys several times, and I told him that what I thought he ought to do is make sure that he had deals for all of the shares before he gave any of his money away to anyone, and that's the only thing Mr. Henkla ever told Mr. Keys. Mr. Henkla went ghost on the Keys a couple of days or so before the 6th. He was repeatedly trying to contact him. Mr. Henkla wouldn't return his calls. That certainly raised some red flags. What happened there? Well, as it was explained below, this happened more or less over a short period of time, on a weekend in a holiday period near New Jersey. You ever purchase real estate, counsel? You never have a problem dealing with the broker when you're trying to buy some real estate. They are always available to make it happen. But I was curious as to why Mr. Henkla wasn't equally as available. You know, Mr. Henkla is a person who is a member, one of six members of the board of managers of this company. He also owns a mortgage bank that has facilities in six states. He's a pretty big person. Yeah, but he got big by selling real estate, not by avoiding a sale. No, he got big by doing mortgages for real estate. He's still in sales. I don't care. You can call it a mortgage or you can call it whatever you want to. He was selling something. I think in my own case, I would picture the fact that I get about 500 e-mails a day, and I have to triage them and I respond to them. That doesn't work because Mr. Henkla knew that this deal had to be closed by April 6th. And he also knew that the keys were trying to close this deal by April 6th. Now, what I'm trying to understand, because the record is not quite clear, is why Mr. Henkla was so unavailable in the run-up to April 6th. I don't believe, Your Honor, that there is any evidence in the record that tells us anything about what Mr. Henkla was doing in those few days. What the trial court found was that it really didn't make any difference what Mr. Henkla was doing because Mr. Key did not, in fact, own that insurance. Well, it makes a difference if he wasn't compliant with his end of the contract, which meant, which read fairly, meant that he would make his best efforts to, you know, assist in the consummation of the purchase. Now, of course, the keys had to have the requisite number of shares, but from the record it appears that the keys were trying to get the requisite number of shares or at least define what the mechanism for purchasing the outstanding shares would be. It does not appear to me that the Pelican defendants had an affirmative duty to assist Key in this regard.  Isn't that more or less what Judge Walsh concluded, that Henkla and Pelican had no obligation or duty under the agreement to assist the Keys in obtaining those shares? Excuse me? Part of Judge Walsh's conclusion? I think that is part of his conclusion. It's also his conclusion the Pelican defendants, by the same token, did not interfere in Mr. Key's ability to get these shares. Well, now, Mr. O'Brien, I think, suggested that there was some thorough evidence that indicated, that would indicate that Pelican, you know, had some obligation because of the, I'll call it what, the opaque nature of the stock ownership and transfer in Pelican, that Pelican had some duty to assist the Keys in gaining title to these shares that were on the spreadsheet. If, right? If Mr. Key had a deal with Mr. Dalheimer to purchase those shares from Mr. Dalheimer, then at that point, I think Pelican, if shown documentation that was true, would have an obligation to transfer those shares on the book to Mr. Keys. There's no question we would have had that duty. That's just not what happened. You're saying that under the cooperation agreement, had there been some indication that Mr. Keys were struggling to secure the transfer of the shares, that Pelican would have a duty to facilitate those transfers? Certainly. If Mr. Key had come to agreements with people to purchase those shares, Pelican would have the obligation to appropriately do the transfer or reissue the certificates. In fact, there were physical certificates. That's almost an administrative task, isn't it, just to execute the transfer on the book? Absolutely ministerial. There is a spreadsheet that tells us who owns how many B shares, and you would take and move one number from that person to somebody else. But I gather none of these transactions or proposed transactions got to that point, except maybe one or two, right, for a small number of shares. I can tell you the history of most of them. There was a case where people in Hawaii had agreed to sell shares to Mr. Key. Mr. Key placed roughly $9,000 in the Pelican account, and then it turned out that the shares in question were owned by three people, and the third person was a person named Obear, and Obear had not entered into the agreement. Only two of those owners had entered into the agreement. That was that block of shares. There was another case that's mentioned in the brief where Mr. Key was trying to buy some shares from a woman whose name starts with D, but I forget it, unfortunately, standing here, and the brief explains to us that first she agreed to sell them, then she said, I don't want to sell them, and then she changed her mind and said, I do want to sell them, and she finished up with, I don't want to sell them. What about the Key's contention that Pelican changed its position on how the transfer should be made? At one point it says, well, you pay the money directly to the shareholder you're buying from, and at another point it says, well, you give it to us and we'll pay the shareholder, all those changes in the procedures made by Pelican was a sort of ex parte, delayed all the stuff that the Keys were supposed to do. It would only have made a difference if the sellers had agreed to sell and the sellers had not agreed to sell, and if the sellers had agreed to sell, then the shares could have been transferred regardless if it went through the Pelican account or whether the money went directly to the shareholder. What's missing is the fact the sellers did not agree to sell and they weren't interested in selling the one or two cents per dollar. I take it that during this whole time period, shares were available directly from Pelican, just more expensive. That was part of the settlement contract. Yeah, but their price seemed like five or ten times the going rate, weren't it? Those shares were priced at about ten cents, Your Honor, and if you want to follow the thought of the probable value of Casa Alegria, which may have been $300,000 or something like that, and you calculate out the number of shares that involved, on a cash basis, those shares were probably worth 20 or 25 cents, and Mr. Key's solution was to attempt to buy them from his fellows at one or two cents, and he wasn't able to buy them. And if he had wanted to, as a part of the settlement, the company had offered to sell him those shares at a discount, ten cents. He didn't follow through on that. All right, we've got it. Thank you very much. We'll give you a little time for rebuttal. May I make three points? The first point regards the amount of shares in the spreadsheet. I would point Your Honors to document 122, the district court's findings. This is lines 16 through 18. It's talking about the spreadsheet. Based on the tally in the spreadsheet, Mr. Key had purchased or agreed to purchase enough shares to buy Casa Alegria. The second point I'd make, Your Honors, is document 116-1, page 38. I think this is extremely important. It's the second to last paragraph. Class B units would carry a right of occupancy based on the dollars lost due to the fraudulent activities of Chris Berry and PEPO. What's lost in this is that Class B shares on their own are essentially worthless. It was given to people who bought houses, dollar for dollar value, of the houses they were defrauded. Mr. Key paid money to buy a house, and because his house wasn't finished as part of the settlement, they couldn't give him a house. They gave him the value of the amount he paid to the property, and then he had the ability to buy more shares because they couldn't transfer that property. The other plaintiffs who sued, they got their houses. They didn't get B shares. Okay, yeah, here's your house for the settlement. His house is not finished. It didn't have a roof. It didn't have any finishings. So they gave him the value of the shares. The whole point of the settlement, the whole point for the Keys was to get the house. They bought a house. They wanted their house. The settlement agreement allowed them to try to get shares for a lower price, and if they couldn't, they just would buy it from 10 cents. They were hindered. And another point that I'd like your honors to consider, it's document 113. It's the transcript, pages 27 to 41. This is what the district court got right. But if it plays out the way the Keys say it played out, he's going to get these units. So you can sit down with your folks and talk to them. I'm going to need them here to testify under oath as to what happened. If they went dark after March 27th until April 7th, the Pelican parties are going to lose. There is no doubt about that, okay? And if this was because the Keys could have cured in that period, you can't do that. You can't go dark for a week and then come up after the deadline and say, oops, sorry, deadline's passed. That's not going to work. That's what the district court got right. I wish the district court would have followed that. Thank you, counsel. If the matter is disargued, you're submitted for decision.
judges: Tashima, Nguyen, Marbley